UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
A.C. and M.C. on behalf of their child, M.C.,

                    Plaintiffs,

         - against -

BOARD OF EDUCATION OF THE
CHAPPAQUA CENTRAL SCHOOL DISTRICT,

                    Defendant.
------------------------------------------------------------x

06 Civ. 4238 (CLB)

***Memorandum and Order***

Brieant, J.

      Plaintiffs initiated this action pursuant to the Individuals with Disabilities in Education Act, *20 U.S.C. §1400, et. seq*., ("IDEA") alleging that Defendant school district failed to provide their child with "a free and appropriate education", as is required by the IDEA, and seeking reimbursement for their private school placement of the child. Before the Court for decision is Plaintiffs' "Motion for modified *de novo* review" from the February 6, 2006 decision of State Review Officer ("SRO") denying reimbursement. (Doc. 4). The SRO held that the Individualized Education Plan ("IEP") developed by Defendant Chappaqua Board of Education provided Plaintiff's son with a free and appropriate education ("FAPE") as is required pursuant to the IDEA. Also before the Court for decision is Defendant School District's motion for summary judgment to uphold the SRO's decision. (Doc. 5).

*Facts / Background*

      M.C. was born on June 10, 1994, and is twelve years old. His disabilities, as described by the IHO, include " 'Pervasive Developmental Disorder' ("PDD"), significant language

disabilities, significant learning disabilities, motor development issue, and sensory dysfunction, including visual defects and auditory processing difficulties." (IHO at 5-6). The IHO further reported that "M's marked attention deficit compromises his cognitive, academic, behavioral and social functioning. M's parents and teacher reported that he had a short attention span, poor social skills, and was easily distracted by extraneous stimuli. His adaptive behaviors, i.e., daily living skills, communication and socialization, were below age expectant levels. Projective tests suggested that M is easily overwhelmed by emotional or complex stimuli, and he may cope with this by generating fantasies or scripting." (IHO at 26. ) M.C. "displays features of an autistic disorder; however, he was characterized as 'high functioning' within that diagnostic category." (SRO at 1).

M.C. entered the District as a pre-school student and attended school in the District's Roaring Brook Elementary School from Kindergarten through fourth grade. When M.C. was nine years old, the District conducted a psychological evaluation, after which the evaluators reported that he exhibited difficulty sustaining his attention in order to understand test directions and required frequent breaks. (SRO at 2.) IQ tests indicated that M.C.'s performance (which put him in the fourth percentile or below in every category) was hindered by severe attention and executive function deficits as well as significant language processing difficulties. (Id.)

During the 2003-04 school year M.C. attended the District school in a "co-teaching support program", in which M.C. was educated within the general education environment with special educational support. The special education services were provided by a special

education teacher and a special education assistant. M.C. was also provided with a full time 1:1 aide, and speech language therapy. (SRO at 2-3).

Defendant's Committee on Special Education ("CSE") met in March, May, June and July of 2004, in order to develop M.C.'s Individualized Education Plan ("IEP") for the 2004-05 school year. The final 2004-05 IEP called for full-time 6:1 co-teaching support program in the general education environment with a full-time (5:1) program assistant. (SRO at 5). The IEP also called for daily integrated individual math instruction and daily individual reading instruction in a separate location, along with occupational therapy and psychological consultation.

At the final CSE, the parents voiced their concerns about M.C.'s progress, and discussed private placement of M.C. The parents specifically requested placement at the Eagle Hill School, a private school for students with disabilities. Defendant's CSE nevertheless recommended the District School as M.C.'s placement, reporting that "the Committee recommended Co-teaching Support Program with Program Assistant and Related Services as an appropriate program in the least restrictive environment." (SD-9 at 3). The parents rejected this conclusion, and by letter dated August 25, 2004, they informed Defendant that they would be enrolling M.C. in Eagle Hill and requested an impartial hearing for the purposes of obtaining reimbursement for the 2004-05 school year.

An Impartial Hearing was held over six days before the IHO. On October 31, 2005, the IHO issued a decision in favor of the Parents, concluding that "M's parents are entitled to

reimbursement for the 2004/05 tuition at Eagle Hill, because the CSE's IEP was substantively flawed, M's parents have shown that Eagle Hill is an appropriate placement for him, and there are no equitable considerations which would bar an award of reimbursement."

The IHO found that there was "a serious substantive error in the IEP process." (IHO at 35.) This substantive error was the failure of the CSE to obtain a Functional Behavioral Assessment ("FBA") for M.C. Citing state and federal regulations, the IHO found that an FBA was required because M.C.'s behavior, including "poor attention, lack of focus, tangential speech and 'fantasy episodes' all significantly interfere with his instruction." (IHO at 36) *(citing 8 NYCRR 200.4(d)(3) and 34 C.F.R. 300.346(a)(2))*. The IHO also found that the District's use of a 1:1 aid, without a plan to reduce dependance on the aide, "may be viewed as a crutch or a palliative measure, especially where, as here, lack of independence is one of the student's most significant deficits." (IHO at 36).

The IHO found that the parents' placement of M.C. at the Eagle Hill school was appropriate, because it provided him a "highly-structured, multi-sensory instruction and intensive remediation in math, reading, and other language arts" and because "M has progressed in the program, academically and socially." The IHO further held that the equities favored the parents.

*SRO*

Defendant appealed the IHO decision, and on February 6, 2006, the SRO reversed the

IHO's decision.  The SRO held that the IHO had erred in concluding that Defendant's failure to conduct a FBA deprived M.C. of a FAPE.  The SRO noted testimony by Defendant's professionals indicating "that during the 2003-04 school year the student's 'primary behavior that needed to be monitored was really with regard to attention."  (SRO at 10) The SRO held that:

> "[Defendant's] CSE considered appropriate strategies, including positive behavioral interventions and supports to address the student's attentions deficits, and developed an IEP which accurately reflected the results of evaluations that identified the student's needs, established annual goals and short-term instructional objectives related to those needs, and provided for the use of appropriate special education services in its creation of an IEP that was reasonably calculated to enable the student to receive educational benefits in the LRE.  Petitioner's decision not to conduct an FBA did not rise to the level of denying the student a FAPE."

For the reasons set forth below, the Court holds that the SRO erred in reversing the IHO and finding that Defendant provided M.C. with a FAPE.

*Discussion*

States that receive funding under IDEA must provide "a free appropriate public education" to each student with a disability. *20 U.S.C. sec. 1400 (d)(1)(A)*. "When a state receiving IDEA funding fails to give a disabled child such an education, the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *M.S. v. Yonkers Bd. of Educ.,* 231 F.3d 96, 102*, citing School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 369-70 (1985).

Initial determinations of the appropriateness of the IEP are made by the IHO and SRO,

5

which "are then subject to 'independent' judicial review." *Walczak v. Florida Union Free School Dist.* 142 F.3d 119, 129 (2d Cir. 1998) *quoting Board of Educ. v. Rowley,* 458 U.S. 176, 205 (1982). The Court "must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak at* 130. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Id at* 129 (*quoting Rowley at* 206, 208).

The inquiry for this Court in assessing a claim for reimbursement by parents for their unilateral placement of their child is: (1) "was the IEP proposed by the school district inappropriate"; (2) "was the private placement appropriate to the child's needs"; and (3) do "equitable considerations" support the parents' claim for reimbursement. *Frank G. v. Board of Educ. of Hyde Park,* 459 F.3d 356, 363 (2d Cir. 2006). The Court will examine each of these considerations in turn.

In determining whether the IEP proposed by the district was appropriate, the Court must determine "(1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Florida Union Free School Dist.* 142 F.3d 119, 129 (2d Cir. 1998) *quoting Board of Educ. v. Rowley,* 458 U.S. at 206-07.
6

"The IDEA requires any State educational agency that receives federal assistance to establish and maintain procedures to safeguard the right of children with disabilities to a free appropriate public education." *J.D. ex rel. J.D. v. Pawlet School Dist.*, 224 F.3d 60, 68 (2d Cir. 2000) (citing 20 U.S.C. § 1415(a)).   Plaintiffs argue that there were several procedural flaws that they claim invalidate Defendant's proposed IEP for M.C.  They claim that Defendant failed to secure the attendance of a parent member at the CSE meeting, and also failed to provide "prior written notice" of its recommendations to the Plaintiffs, which are both requirements under New York law.  The Court agrees with the IHO that these technical deviations did not constitute a denial of a FAPE.  The failure to provide "prior written notice" to Plaintiffs caused no harm or prejudice to M.C. or his parents, because the record shows that the parents in fact knew of the CSE's determination regarding their preferred placement at Eagle Hill.  As to the Defendant's failure to secure the attendance of the parent member at one of the CSE meetings, it is clear that the parent member was at the meeting where the 2004-05 IEP was promulgated.  This deviation is also insufficient to constitute a deprivation of a FAPE.

Plaintiffs also attack the sufficiency of the IEP by arguing that its "goals and objectives were inappropriate and failed to promote M.C.'s independence and progress."  Plaintiffs claim that M.C. goals and objectives were written before his progress was even assessed from the previous school year. They also argue that testimony during the proceedings showed that his teachers and therapists provided by the district did not alter the goals and objectives for M.C. after they tested him.  This, plaintiffs argue, constituted impermissible "predetermination" under

7

the IDEA.

The Court also concludes, as did the IHO, that these procedural faults in the IEP process were insufficient to constitute a deprivation of a FAPE. As the IHO noted, the fact that some of M.C.'s goals and objectives were drafted before the CSE meeting in which the final goals and objective for that year were promulgated did not in itself deny M.C. a FAPE.

Plaintiffs also argue that defendant's failure to assess M.C.'s behavior was a FAPE deprivation, citing New York State Commissioner of Education's Part 200 Regulations, which requires "a functional behavioral assessment ("FBA") for a student whose behavior impedes his or her learning or that of others." *8 NYCRR 200.4(b)(1)(v)*. Plaintiffs argue that, notwithstanding defendant's representations to the contrary, M.C.'s behavior was clearly detrimental to his learning and required an FBA.

Defendant argues that an FBA was unnecessary, because most of M.C.'s "interfering" behaviors had to do with his attention span, which was addressed in substance by the IEP. Defendant argues that "[t]echnical deviations in an IEP do not render it invalid and in determining its adequacy procedurally, deference should be given to the SRO's decision." *8 NYCRR 200.4(b)(1)(v)*.

The Court concludes, as did the IHO, that Defendant's failure to conduct an FBA constituted a deprivation of a FAPE to M.C. Defendant's own IEP for the 2004-04 school year

expressly states that the student's "[b]ehavior seriously interferes with instruction due to frequent tuning out and inattention." As the IHO noted, it is clear from the record that "M's poor attention, lack of focus, tangential speech and 'fantasy episodes' all significantly interfered with his instruction." Although the CSE Chairperson, Dr. Jerry Wishner, opined that an FBA would be necessary only where the child's behavior was "challenging" or "hostile", the regulation is clear that an FBA is required to assess a child's behavior where it "impedes his... learning." "The initial procedural inquiry is no mere formality." *Walczak v. Florida Union Free School Dist.* 142 F.3d 119, 129 (2d Cir.1998). The record is clear that M.C.'s behavior did impede his learning, and therefore Defendant's failure to conduct an FBA in accordance with state regulations constituted a deprivation of a FAPE.

Plaintiffs also argue that the IEP developed by the defendant school district was substantively inappropriate. Plaintiffs argue that Defendant provided M.C. with one-on-one support without attempting to increase his independence and ability to function without that help. Plaintiffs claim that this "essentially kept M.C. is a state of learned helplessness", and even caused M.C. to regress.

Defendant argues that the IEP was reasonably calculated to afford M.C. a FAPE and the SRO decision to that effect is to be afforded deference. Defendant argues that the IEP was developed by experienced educators who sought to balance the goals of allowing MC to remain in the middle school with his peers, with his needs for individualized attention.

The Court holds that the IEP was not reasonably calculated to afford M.C. a FAPE. It is true that the District provided M.C. with extensive "support", most notably in the form of a 1:1 aide throughout the day. But as the IHO noted, "the constant presence of a 1:1 aide may be viewed as a crutch or palliative measure, especially where, as here, lack of independence is one of the student's most significant deficits. The 1:1 aide may have been very inhibiting in the proposed middle school placement, where he or she would have followed M from class to class."

Defendant's failure to address the need to increase M's independence conforms to the pattern of "learned helplessness" that was being fostered by the District's IEP. This approach is epitomized by the District's designation of a separate bathroom facility for M.C., and the fact that the District admitted that there was no "instruction goal aimed to have M. use a community bathroom." By failing to address M.C.'s need to increase his independence, and indeed by fostering "learned helplessness" through the indefinite use of a 1:1 aide, the Court concludes that the IEP was substantively inadequate and not reasonably calculated the provide M.C. with a FAPE.

In order to award reimbursement under the IEP, the Court must also determine "that the private education services obtained by the parents were appropriate to the child's needs." *Walczak at 129*. "The test for the parents' private placement is that it is appropriate, and not that it is perfect." *Warren G. V. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999) (quoted by M.S. v. City of Yonkers at 104)*.

The Court concludes, as did the IHO, that the parents have carried their burden of showing that Eagle Hill was an appropriate placement for M.C.  As the IHO noted, the record amply demonstrates that "M has progressed in the program, academically and socially."  Perhaps most important is M.C.'s "ability to function in classes and navigate the Eagle Hill campus without a 1:1 aide indicate increased independence, and important goal for him."

As M.C.'s instructors at Eagle Hill, as well as his parents, testified, the progress that M.C. made at Eagle Hill only highlight the very deficiencies of the District IEP. He no longer needed to use a private bathroom, and his independence dramatically improved. (Tr. 1276-1277); his eye contact improved (Tr. 1285); he no longer needed "squish balls" and pillows that had been used to regulate his sensory issues, that had been necessary at the District placement.

The Court holds that the parents have clearly demonstrated the appropriateness of M.C.'s placement at Eagle Hill.

The Court also concludes that the equities favor the Plaintiffs in this case.  "[B]ecause the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'"  *Frank G. at* 363-364 (*quoting Burlington at* 374.) As the IHO found in the administrative hearing,  "the cost of tuition at the program is reasonable, there was cooperation and communication on the parents' part, and the hearing request was timely." (IHO at 38).

## Conclusion

The parties shall attempt to agree on a proposed form of judgment, or settle a judgment on ten (10) days notice if unable to agree. Plaintiffs' counsel shall submit his lodestar with the proposed judgment, which shall be received no later than May 31, 2007.

X

      X

          X

              X

                  X

                    X

                      X

SO ORDERED.

Dated: White Plains, New York
      April 26, 2007

                                              _____
                                              Charles L. Brieant, U.S.D.J.